# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DENGRONG ZHOU, )
           )
           Plaintiff/Counterclaim )
           Defendant, )
           )
           v. ) **C.A. No. 2021-0026-JRS**
           )
LONG DENG and MARK FANG, )
           )
           Defendants/Counterclaim )
           and Third Party Claim )
           Plaintiffs, )
           )
         and )
           )
iFRESH, INC., a Delaware corporation, )
           )
           Nominal Defendant, )
           )
           v. )
           )
QIANG OU, KAIRUI TONG, HAO )
HUANG, HUBEI RONGENTANG WINE )
CO., LTD., HUBEI RONGENTANG )
HERBAL WINE CO., ZHANG FEI, )
LIU MENG, JIUXIANG BLUE SKY )
TECHNOLOGY (BEIJING) CO, LTD., )
and HK XU DING CO., LIMITED, )
           )
           Third Party Defendants. )

## MEMORANDUM OPINION

Date Submitted:  March 17, 2022
Date Decided:  April 6, 2022

Peter B. Ladig, Esquire and Sarah T. Andrade, Esquire of Bayard, P.A., Wilmington, Delaware and Stephen M. Plotnick, Esquire, Alexander G. Malyshev, Esquire and Matthew D. Dunn, Esquire of Carter Ledyard & Milburn LLP, New York, New York, Attorneys for Plaintiff Dengrong Zhou.

John G. Harris, Esquire of Berger Harris LLP, Wilmington, Delaware and Angus F. Ni, Esquire and Times Wang, Esquire of AFN Law, PLLC, Seattle, Washington, Attorneys for Defendants/Counterclaim and Third Party Plaintiffs Long Deng and Mark Fang.

**SLIGHTS, Vice Chancellor**

Plaintiff, Dengrong Zhou, a stockholder of iFresh, Inc. ("iFresh"), brings this action under 8 *Del. C.* § 225 ("Section 225") against Defendants, Long Deng and Mark Fang, to obtain a declaration that a written consent executed by a majority of iFresh's stockholders, including Zhou (the "Consent"), validly removed Defendants from iFresh's board of directors (the "Board") and elected Qiang Ou and Jiandong Xu in their stead. In response, Defendants have filed verified counterclaims against Zhou in which they seek a declaration that the Consent was invalid because Zhou and his allies obtained their iFresh shares through fraud, aiding and abetting breaches of fiduciary duty and breach of contract.

After a two-day trial, and after carefully considering the evidence and arguments of counsel, I am persuaded that Defendants were properly removed from iFresh's Board and Ou and Xu were properly appointed to take their place. A final judgment to that effect will be entered for Plaintiff.

## I. BACKGROUND

Many of the facts relevant to this dispute were stipulated by the parties.[1] Otherwise, the facts detailed below are drawn from the competent evidence presented at trial.

---

[1] Citations in the form of "PTO __" refer to the Joint Pre-Trial Stipulation and Order (D.I. 186). Citations in the form of "JX __" refer to joint exhibits in the trial record. Citations in the form of "Tr. __ ([Last Name])" refer to the trial testimony of the identified

1

## A. The Parties

iFresh is a Delaware corporation with its principal place of business in New York, New York.[2] It was previously listed on the NASDAQ exchange but was delisted on November 23, 2021, during the pendency of this litigation.[3]

Plaintiff, Dengrong Zhou, is a record stockholder of iFresh owning 1,031,679 (2.844%) shares of common stock.[4] His iFresh shares were voted in the Consent.[5]

Defendant, Long Deng, is the CEO of iFresh and was Chairman of the Board.[6] Deng holds 7,475,704 (20.609%) shares of common stock.[7] Defendant, Mark Fang,

---

witness. And citations in the form "[Last Name] Dep. __" refer to the deposition testimony of the identified witness as lodged with the Court.

[2] PTO ¶ 16.

[3] PTO ¶¶ 16, 40–43. iFresh was initially listed on NASDAQ in February 2017. JX 90 at 37. According to iFresh's 2019 Form 10-K, by 2019, iFresh was in default on its Credit Facility with Key Bank, which "raise[d] substantial doubt about the Company's ability to continue as a going concern." JX 25 at 25. To address the default, iFresh entered into a forbearance agreement with Key Bank in October 2019. JX 35 at 6. Soon after, as iFresh stock was trading at ~$1 per share, NASDAQ warned iFresh that it was not in compliance with NASDAQ's listing requirements and threatened delisting. JX 41; JX 47; PTO ¶ 37 ("iFresh has received notifications from the NASDAQ Listing Qualifications Staff stating that the Company was not in compliance with NASDAQ Rules . . . ."). Deng sought the initial investment from Zhou on behalf of iFresh, as detailed below, in the midst of this turbulence. Tr. 54:22–55:11 (Zhou).

[4] PTO ¶ 18.

[5] PTO ¶ 11.

[6] PTO ¶ 19.

[7] *Id.*

was also a member of iFresh's Board and holds 6,000 (0.017%) shares of its common stock.[8]

## B. The Consent

On January 12, 2021, Zhou and six other iFresh stockholders, collectively holding 52.29% of the issued and outstanding shares of iFresh voting stock (the "Control Group"), purported to remove Deng and Fang from iFresh's Board and elect Qiang Ou and Jiandong Xu in their stead via the Consent.[9] As discussed below, the members of the Control Group obtained their iFresh stock through various transactions, each of which are challenged by Defendants.

In January 2019, HK Xu Ding Co. Ltd. ("HK XD") entered into a purchase agreement with Deng to acquire 8,294,989 shares of iFresh stock for $7,050,741.[10] HK XD held 22.87% of iFresh voting stock when the Consent was signed.[11]

---

[8] PTO ¶ 20.

[9] PTO ¶¶ 32–35.

[10] PTO ¶ 37(f) ("Mr. Long Deng CEO and major shareholders of the Company sold an aggregate of 8,294,989 restricted shares to HK XD, representing 51% of the total issued and outstanding shares of the Company as of December 31, 2018."); HK Xu Ding Co., Ltd.'s Mem. in Supp. of its Mot. to Dismiss Count II (D.I. 146) Ex. 1 (Order of Supreme Court of the State of New York County of New York) ("Long Deng[] sold 8,294,989 shares of iFresh, Inc., a Delaware Corporation to HK Xu Ding Co. Limited, a Hong Kong Corporation for a total price of $7,050,741.00.").

[11] PTO ¶ 32(a).

In March of 2020, iFresh entered into a purchase agreement with Zhou and Qiang Ou (the "Zhou and Ou Agreement"). Under the Zhou and Ou Agreement, iFresh sold Zhou 1,031,679 iFresh shares and sold Ou 751,488 iFresh shares, resulting in Zhou owning 2.84% and Ou owning 2.07% of iFresh's voting stock when the Consent was signed.[12]

On March 26, 2020, iFresh entered into a purchase agreement with Kairui Tong and Hao Huang (the "RET Wine Agreement").[13] Under that agreement, iFresh received Tong and Huang's 100% interest in two herbal wine companies, Hubei Rongentang Wine Co., Ltd. and Hubei Rongentang Herbal Wine Co., Ltd. (collectively, "RET Wine"), in exchange for 3,852,372 shares of iFresh's common stock and 1,000 shares of the Company's Series B Convertible Preferred Stock.[14] Tong obtained 2,311,423 of the total shares and Huang obtained 1,540,949 shares, amounting to 6.37% and 4.25% voting interests in iFresh, respectively.[15]

On August 6, 2020, iFresh entered into a purchase agreement with Fei Zhang and Meng Liu (the "Jiuxiang Agreement"). Under that agreement, Zhang and Liu sold iFresh their 100% equity interest in Jiuxiang Blue Sky Technology

---

[12] PTO ¶¶ 32(b), 32(c), 55.

[13] PTO ¶ 61.

[14] *Id.*

[15] PTO ¶ 32(d), 32(e).

4

(Beijing) Co., Ltd. ("Jiuxiang") for 5,036,298 shares of iFresh common stock (4,532,668 shares to Zhang and 503,630 shares to Liu) and 1,000 shares of Series C convertible preferred stock.[16]

As permitted by iFresh's bylaws,[17] having acquired their iFresh shares as just described, the Control Group executed the Consent purporting to remove Deng and Fang as directors on January 12, 2021.[18]  It was delivered that same day to iFresh's registered office and principal place of business.[19]  Defendants do not dispute that the Consent was proper as to form or that it was delivered in accordance with the iFresh bylaws and Delaware law.[20]

## C. Procedural History

Upon delivery of the Consent, Zhou immediately filed this Section 225 action seeking a declaration that the Consent was valid.[21]  Defendants responded by filing

---

[16] PTO ¶¶ 32(f), 32(g), 65.

[17] PTO ¶¶ 29–31 (citing bylaws and stipulating that "iFresh directors may be removed by a vote of stockholders under iFresh's By-Laws").

[18] PTO ¶¶ 33–34.

[19] PTO ¶ 35.

[20] Neither Defendants' pre-trial briefs nor their post-trial briefs advanced an argument that the Consent was invalid as a matter of form, as violative of the iFresh bylaws, or as violative of the Delaware General Corporation Law.  Any such arguments, therefore, would properly be deemed waived.  *See Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 (Del. 2019).

[21] D.I. 1, 3.

an Answer, Affirmative Defenses, Verified Counterclaim and Third-Party Complaint on February 26, 2021.[22] Third-Party Defendants moved to dismiss that pleading as to them and, after full briefing on the motion, without leave of Court, Defendants (as Third-Party Plaintiffs) filed an Amended Third-Party Complaint just days before oral argument.[23] The Court deferred ruling on that motion but ultimately dismissed the Amended Third-Party Complaint for failure to state viable claims on January 21, 2022.[24]

A few weeks before trial, Defendants sprang another new pleading, this time bringing a motion to file an amended counterclaim (the "Amended Counterclaim").[25] The Amended Counterclaim substantially expanded the factual predicate of existing claims and advanced entirely new claims under Section 225 in support of a declaration that the Consent was invalid because the stock purchases in

---

[22] D.I. 35.

[23] D.I. 83, 125.

[24] D.I. 190. The principal bases for the Court's dismissal of the third-party claims were that Deng and Fang sought to bring *in personam* claims against individuals who did not wish to participate in this *in rem* proceeding and did not assert a right to corporate office, and otherwise sought impermissibly to expand the scope of this summary litigation. *See* D.I. 193 (the Court's oral ruling on the motion to dismiss the Amended Third-Party Complaint).

[25] D.I. 173.

which members of the Control Group acquired their iFresh stock were invalid.[26] The Court granted the motion to amend subject to certain conditions.[27]

The Court held a two-day trial on January 24 and 25, 2022.[28] After post-trial briefs, closing arguments and Defendants' unsolicited supplemental submission, the matter was deemed submitted on March 17, 2022.[29]

## II. ANALYSIS

As noted, Zhou initiated this action seeking a declaration under Section 225 that the Consent was valid. Given the apparent agreement that the Consent was valid as a matter of iFresh's constitutive documents and as a matter of law, the parties focused at trial and in the post-trial briefing on Defendants' Amended Counterclaim. Put simply, Defendants contend that the Court should invalidate the Consent because the shares that were voted in the Consent were products of aiding and abetting breaches of fiduciary duty, breach of contract or fraud. For the reasons explained below, Defendants have failed to carry their burden to prove any of these bases to

---

[26] *See* D.I. 173 ¶¶ 140–73. The amended pleading also asserted third-party claims, which, as noted, were dismissed.

[27] D.I. 194. Specifically, the Court required Defendants to provide certain additional discovery related to the many new factual allegations set forth in their amended pleading by a date certain in advance of trial. *Id.*

[28] D.I 196–97.

[29] D.I. 198–99, 203–04.

invalidate the Consent. Before addressing the claims *seriatim*, however, it is useful first to set the table by laying out the purpose and scope of Section 225.

### A. Purpose and Scope of Section 225

"The purpose of Section 225 is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office."[30] Because a Section 225 proceeding is summary in nature, and narrow in purpose,[31] the scope of the proceeding is "limited to determining those issues that pertain to the validity of actions to elect or remove a director or officer."[32] In other words, for a claim to be adjudicated in a 225 proceeding, the adjudication must be necessary to "help the court decide the proper composition of the corporation's board or management team."[33]

---

[30] *Box v. Box*, 697 A.2d 395, 398 (Del. 1997).

[31] *See Kahn Bros. & Co. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov. 15, 1988) ("An action under Section 225 is, it is true, a special statutory action that is, in some respects, narrow.").

[32] *Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011).

[33] *Id.*; *see also Adlerstein v. Wertheimer*, 2002 WL 205684, at *7 (Del. Ch. Jan. 25, 2002) ("[A] Section 225 proceeding is limited to those issues that must necessarily be considered in order to resolve a disputed corporate election process."); *Genger*, 26 A.3d at 199 (holding that Section 225 envisions "an *in rem* proceeding, where the 'defendants' are before the court . . . as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office)").

8

When addressing a claim to corporate office under Section 225, the Court may consider whether the claim is tainted by fraud, deceit or breach of contract.[34] But that determination may be made "only for the purpose of determining the corporation's *de jure* directors and officers," not for the purpose of assessing *in personam* liability for actionable wrongdoing.[35] Any issues that stray from Section 225's narrow scope are collateral and will not be considered.[36] Specifically, the court "cannot go further and actually rescind a transaction procured through such unlawful behavior or award money damages to those harmed by that behavior."[37] That plenary relief "can only be obtained in a plenary action in a court that has *in personam* jurisdiction over any necessary or indispensable parties."[38]

Here, Defendants assert that Zhou and others have engaged in wrongdoing. The Court will consider Defendants' evidence of wrongdoing, but only to the extent relevant to the narrow question to be adjudicated—is the Consent valid?

---

[34] *Brown v. Kellar*, 2018 WL 6721263, at *6–7 (Del. Ch. Dec. 21, 2018) (quoting *Genger*, 26 A.3d at 200).

[35] *Genger*, 26 A.3d at 200.

[36] *Brown*, 2018 WL 6721263, at *6.

[37] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. Apr. 12, 1999); *see also Marks v. Menoutis*, 1992 WL 22248, at *5 (Del. Ch. Feb. 3, 1992) ("The Court cannot directly order a transaction to be rescinded in a § 225 proceeding.").

[38] *Genger*, 26 A.3d at 200.

## B. The Consent Was Proper in Form and Function

To reiterate, the parties do not appear to dispute that the Consent was proper in form and function, and for good reason.[39] The Consent adhered to both Delaware law and iFresh's bylaws.[40] As indicated by iFresh's shareholders list,[41] Zhou, Qiang Ou, Kairui Tong, Hao Huang, Zhang Fei, Liu Meng, and HK XD (the members of the Control Group) were record holders of 52.29% of iFresh's outstanding shares on January 12, 2021.[42] Delaware law is "well established" that "the person with an enforceable legal right to vote its stock is the registered owner of such stock."[43] As the holders of a majority of iFresh's issued and outstanding stock, the Control Group could remove Deng and Fang and elect Ou and Xu to take

---

[39] *See* PTO ¶¶ 29–36.

[40] Under Delaware law, "[s]tockholders may, unless the certificate of incorporation otherwise provides, act by written consent to elect directors." 8 *Del. C.* § 211(b); *see* PTO ¶¶ 29–31; JX 4 at 3 (Amended & Restated Bylaws of iFresh Inc., Article II, Section 6); *see also id.* at 4 (Article III, Section 12) (allowing the removal of directors by a vote of stockholders).

[41] *See* JX 134; 8 *Del. C.* § 219(c) ("The stock ledger shall be the only evidence as to who are the stockholders entitled by this section to examine the list required by this section or to vote in person or by proxy at any meeting of stockholders.").

[42] *See* PTO ¶¶ 32–33; JX 146 (Defendants' Objections and Verified Responses to Plaintiff's First Request for Admission) at Response Nos. 1–7.

[43] *Len v. Fuller*, 1997 WL 305833, at *3 (Del. Ch. May 30, 1997); *see also Testa v. Jarvis*, 1994 WL 30517, at *6 (Del. Ch. Jan. 12, 1994) ("Delaware corporations may rely almost exclusively on the stock ledger to determine the record holders eligible to vote in an election . . . . Where the company's ledgers show record ownership, no other evidence of shareholder status is necessary.").

their place on the Board via written consent.[44]  They did so when they delivered the Consent to iFresh's registered office and principal place of business.[45]  Thus, Zhou's request for declaratory relief under Section 225 is *prima facie* valid.[46]

With Zhou's *prima facie* case proven, I begin my analysis of the Counterclaims mindful that, in Delaware, a stockholder's right to vote in all respects, including in the election of the corporation's directors, is "sacrosanct."[47]  In the face of a valid stockholder consent reflecting the votes of the majority of iFresh's stock,

---

[44] PTO ¶¶ 33, 35; JX 133A (Resolutions Adopted by Written Consent of Stockholder).

[45] PTO ¶¶ 33, 35; JX 133–133B (Written Consent with email and letter).

[46] *See Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *1 (Del. Ch. Aug. 5, 2016) (holding that "inclusion on the stock ledger states a *prima facie*, but rebuttable, case that a plaintiff is a statutory stockholder of record"); *id.* at *3 ("In a typical case, the stock ledger controls record-stockholder status, and a stockholder may point to the stock ledger to show, *prima facie*, that she is in fact a holder of record."); *Kerbawy v. McDonnell*, 2015 WL 4929198, at *13 (Del. Ch. Aug. 18, 2015) ("[T]he parties do not dispute the validity of the Consents on any technical grounds.  I therefore conclude that the Consents are presumptively valid . . . .").

[47] *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012); *see also San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *7 (Del. Ch. Oct. 28, 2010) ("Stockholders exercise their authority over corporate affairs by way of ballots.  Accordingly, the right to vote on certain matters—most importantly the election of directors—is a fundamental power reserved to the stockholders."); *In re MONY Gp., Inc. S'holder Litig.*, 853 A.2d 661, 673 (Del. Ch. 2004) ("The shareholder franchise occupies a special place in Delaware corporation law . . . ."); *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126 (Del. 2003) ("The stockholders' power is the right to vote on specific matters, in particular, in an election of directors.").

11

Defendants face a real challenge to justify a declaration that the apparent will of the stockholders should be overturned.[48]

## C. Defendants Did Not Prove the Stockholder Consent Was Invalid

As noted, to rebut Zhou's *prima facie* case, Defendants maintain that the Court should invalidate the Consent because members of the Control Group wrongfully obtained their shares.[49]  Specifically, Defendants argue: (1) Zhou aided and abetted iFresh's CFO, Amy Xue, in her breach of fiduciary duty as she supported his scheme to acquire control of iFresh; (2) HK XD did not pay for all of the shares it purchased and therefore breached the contract whereby it acquired the shares; and (3) Zhou and

---

[48] *Cf. Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 n.2 (Del. Ch. 1988) ("Delaware courts have long exercised a most sensitive and protective regard for the free and effective exercise of voting rights.  This concern suffuses our law, manifesting itself in various settings."); *Paramount Commc'ns v. QVC Network*, 637 A.2d 34, 42 (Del. 1994) ("Because of the overriding importance of voting rights, this Court and the Court of Chancery have consistently acted to protect stockholders from unwarranted interference with such rights."); *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 (Del. 1982) (finding that "careful judicial scrutiny will be given a situation in which the right to vote for the election of successor directors has been effectively frustrated"); *Kerbawy*, 2015 WL 4929198, at *13 ("In a case like this one, where a majority of stockholders have executed written consents removing the Board and the Board asks this Court to set aside the consents on equitable grounds, that burden is a heavy one.  This is particularly true in light of the importance Delaware law places on protecting the stockholder franchise, which has been characterized as the ideological underpinning upon which the legitimacy of the directors['] managerial power rests.") (internal quotation marks omitted).

[49] As I observed at the close of trial, Defendants' claims in this regard were extremely difficult to follow, both as a matter of law and in the evidence presented at trial.  Tr. 339:13–343:1 (Court).  That, unfortunately, has remained the case throughout my post-trial deliberations.

the other stockholders fraudulently obtained their shares. Defendants bore the burden of proof on each these Counterclaims.[50]

Before turning to the merits, it is necessary to address Zhou's contention that many of the arguments Defendants posited in post-trial briefing should be deemed waived since Defendants did not preserve the arguments in their pleadings or in the pretrial order.[51] "The doctrine of waiver operates to ensure fairness by requiring that notice be given to the adverse party."[52] Arguments that are not raised until pre-trial briefing or after may be deemed waived by the Court.[53] By that time, the opposing

---

[50] *See, e.g.*, *Kerbawy*, 2015 WL 4929198, at *13 ("Regardless of the theory under which the removal or election of a director is challenged, 'the burden of proving that a director's removal or election is invalid rests with the party challenging its validity.'") (quoting *Unanue v. Unanue*, 2004 WL 5383942, at *10 (Del. Ch. Nov. 9, 2004)); *id.* ("[T]he parties do not dispute the validity of the Consents on any technical grounds. I therefore conclude that the Consents are presumptively valid . . . .").

[51] *See* Pls.' Post-Trial Answering Br. ("PAB") (D.I. 203) at 15–21.

[52] *Lavin v. W. Corp.*, 2017 WL 6728702, at *12 n.91 (Ch. Dec. 29, 2017); *see also* *PharmAthene v. SIGA Techs., Inc.*, 2001 WL 6392906, at *2 (Del. Ch. Dec. 16, 2011) ("The general rule . . . that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim or oppose a defense, the adverse party deserves sufficient notice of the claim or defense in the first instance.").

[53] *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012) ("When an argument is first raised in a pretrial brief after the parties already have shaped their trial plans, it is simply too late and deemed waived.").

13

party has already shaped his trial plans, and it is simply too late and unfair to expect him meaningfully to confront the arguments so close to (or after) trial.[54]

Against better judgment, the Court has indulged Defendants' past attempts to inject untimely new claims into this case. Contrary to Chancery Rule 15(aaa), Defendants filed an amended third-party complaint after full briefing on the motion to dismiss their initial third-party complaint was submitted.[55] Then, on the eve of trial, the Court allowed Defendants, over strong objection, to file an Amended Counterclaim in which they nearly doubled their factual allegations and added new substantive claims.[56] After trial, Defendants' arguments shifted yet again. Arguments that were not previewed in the Amended Counterclaim, pretrial order or pretrial briefs made their debut in Defendants' post-trial briefs.

Defendants' ever-changing claims and theories of liability conjure images of the arcade game "whack-o-mole," where every time Zhou bops an argument or theory advanced by Defendants on the head, Defendants suddenly appear

---

[54] *See id.*; *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *18 (Del. Ch. Aug. 18, 2006) (refusing to consider untimely arguments).

[55] Ct. Ch. R. 15(aaa) ("Notwithstanding subsection (a) of this Rule, a party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed.").

[56] Defs.' Verified First Am. Countercl. and Second Am. Third-Party Compl. ("Am. Countercl.") (D.I. 173).

somewhere else on the board with a new one. For the sake of clarity, given the number of waived arguments, I have determined it makes most sense to take them as they come while addressing each of the Amended Counterclaims' proffered bases to invalidate the Consent. I have paused to address waiver at this point only to emphasize how frequently it has occurred.

### 1. Breach of Fiduciary Duty

Defendants seek to invalidate the Consent by arguing Zhou aided and abetted Amy Xue, iFresh's CFO, in the breach of her fiduciary duties to iFresh.[57] Defendants contend that Xue owed fiduciary duties to iFresh and breached those duties "at the direction, and for the benefit of her true boss, Zhou."[58] According to Defendants, Xue's breach of fiduciary duty facilitated the Control Group's acquisition of shares.[59] As such, Defendants assert that the votes obtained by Zhou should be invalidated.

The breach of fiduciary duty and aiding and abetting arguments were not introduced as grounds to invalidate the Consent until after trial in Defendants' post-

---

[57] Defs./Countercl. Pls.' Post-Trial Br. ("DOB") (D.I. 199) at 19–23.

[58] *Id.* at 20.

[59] *Id.* at 20–23.

trial brief.[60]   That is "too late to argue a new claim."[61]   Defendants' pretrial brief

mentions Amy Xue's involvement in this case in its recitation of the background

facts.[62]   But neither the Amended Counterclaim, the pretrial order nor the pretrial

briefing provided Zhou with *any* indication that a breach of fiduciary duty or aiding

and abetting claim was on the table for trial.   Indeed, the phrases "aiding and

abetting" and "fiduciary duty" do not appear a *single time* in the Amended

Counterclaim, the pretrial order or the pretrial briefs.[63]   Consequently, Zhou had no

reason to suspect that this claim would be advanced at trial (or after) and no reason

or ability to be prepared to address it.[64]   The argument is deemed waived.

---

[60] *Id.* at 19–21.

[61] *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *22 (Del. Ch. May 27, 2015); *see also Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *44 (Del. Ch. Apr. 30, 2021) ("When an argument is first raised in a *pre-trial* brief after the parties already have shaped their trial plans, it is simply too late and deemed waived.") (emphasis added) (quoting *ABC Woodlands*, 2012 WL 3711085, at *3).

[62] *See* Defs.' Pre-Trial Br. (D.I. 175) at 1–47.  Of course, raising a claim for the first time in a pre-trial brief, even if fully presented, is also too late.  *Snow Phipps Gp., LLC*, 2021 WL 1714202, at *44.

[63] *See generally* Am. Countercl. (D.I. 173); Pretrial Stipulation and Order (D.I. 186); Defs./Countercl. and Third-Party Claim Pls.' Trial Br. (D.I. 175).

[64] *See ABC Woodlands*, 2012 WL 3711085, at *3 (concluding that the plaintiff's argument was waived because "merely alluding [to a claim] in [the] recitation of the background facts" was not sufficient to put the opposing party on notice); *In re PNB Hldg.*, 2006 WL 2403999, at *18 (deeming claims waived that were only generally addressed in the pretrial process and then raised at trial).

## 2. Breach of Contract

Defendants seek to invalidate the votes cast by HK XD on grounds of breach of contract.[65] HK XD purchased its iFresh stock from Deng but only paid $5 million of the roughly $7 million purchase price for the shares.[66] After HK XD did not pay the full amount owed, Deng sued HK XD for breach of contract in New York,[67] where he prevailed and obtained a money judgment for the remaining amount owed by HK XD—approximately $2 million.[68] Defendants argue that HK XD's votes should be invalidated because HK XD breached the contract by which it acquired the shares that were voted.[69]

In response, Zhou argues that "Deng has already elected his remedies with respect to the HK XD transaction by suing for breach of contract in New York and

---

[65] DOB at 25.

[66] *See* PTO ¶¶ 76, 79(b); *see also* HK Xu Ding Co., Ltd.'s Mem. in Supp. of its Mot. to Dismiss Count II (D.I. 146) Ex. 1 (Order of Supreme Court of the State of New York County of New York ("Long Deng[] sold 8,294,989 shares of iFresh, Inc., a Delaware Corporation to HK Xu Ding Co. Limited, a Hong Kong Corporation for a total price of $7,050,741.00. At the closing of said deal, HK Xu Ding Co., Ltd. paid only $5,000,000.00, and the rest remains unpaid. Based upon same, the Court entered a judgment in the amount of $2,050.741.00, plus statutory interest . . . .").

[67] *See* JX 51 (Complaint filed in New York state court).

[68] DOB at 25.

[69] *Id.*

17

obtaining a money judgment."[70]  According to Zhou, because Deng affirmatively sought and was awarded money damages, he is now foreclosed from pursuing rescission of the HK XD/Deng transaction.[71]

The Court may invalidate a corporate election that is tainted by a breach of contract.[72]  But for a breach of contract to be relevant in a Section 225 case, it must affect the validity of the vote or consent at issue.[73]  In their effort to counter this proposition, Defendants point to a single sentence, taken out of context, from this Court's *Zohar* decision to argue that *any* breach of contract with respect to the acquisition of shares can serve as a basis to disregard an effort to vote those shares: "[A] party cannot exercise voting rights that it obtains from another in breach of contract."[74]

---

[70] PAB at 22–23.

[71] *Id.* at 22.

[72] *See Agranoff*, 1999 WL 219650, at *18 ("In a § 225 action . . . , this court can determine that a person does not hold corporate office because he obtained the office through fraud or breach of contract."); *Genger*, 26 A.3d at 200 ("[I]n a Section 225 action, a plaintiff may claim that a director-respondent does not validly hold corporate office because that director obtained the office through fraud, deceit, or breach of contract.").

[73] *See Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377, 392 (Del. 2010) (invalidating votes because the transfer of voting and economic rights violated a transfer restriction in a restricted stock grant agreement); *Zohar II 2005-1, Ltd. v. FSAR Hldgs., Inc.*, 2017 WL 5956877, at *22 (Del. Ch. Nov. 30, 2017) (same).

[74] DOB at 25 (quoting *Zohar II*, 2017 WL 5956877, at *22).

Defendants stretch *Zohar* too far. In *Zohar*, the voting and transfer rights of the shares at issue were the precise subject of the contractual provision that was breached.[75] That breach gave rise to a rescission remedy that rendered the contract "invalid and ineffective."[76] Thus, assessing the contractual breach was vital to determine the validity of the vote for purposes of Section 225. But *Zohar* does not stand for the proposition that *any* showing of a breach of contract provides a basis to set aside a stockholder vote in a Section 225 action. In this case, any breach of contract resulting from a failure to pay has already been addressed and the remedy for the breach was an award of money damages.[77] There was no rescission of the contract; it remains valid and enforceable.[78] There is, therefore, no basis to declare that a breach of contract has negated HK XD's right to vote its shares.

---

[75] *Zohar II,* 2017 WL 5956877 at *22 ("Our Supreme Court held in *Crown EMAK Partners, LLC v. Kurz* that a party cannot exercise voting rights that it obtains from another in breach of contract. That is precisely what has occurred here. . . . Under Section 7.8(a)(i), the Zohar Funds may not 'sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber . . . , any part of the Collateral, except as expressly permitted by the Indentures.' . . . Because the shares are Collateral, and because voting rights are a 'part of' those shares, any transfer . . . of those voting rights . . . violated Section 7.8(a)(i) of the Indentures.") (cleaned up).

[76] *Id.* at *23, *39.

[77] *See* JX 51 at 9.

[78] Under New York law, which governs the contract at issue, "the equitable remedy [of rescission] is to be invoked only when there is lacking complete and adequate remedy at law and where the *status quo* may be substantially restored." *Rudman v. Cowles Commc'ns, Inc.*, 280 N.E.2d 867, 874 (N.Y. 1972); *see also Romanoff v. Romanoff*, 51 N.Y.S.3d 36, 39 (App. Div. 2017) ("The remedy of rescission is unavailable [where]

19

### 3. Fraud

In certain circumstances, proven fraud can also be a basis to set aside a stockholder vote in a Section 225 action.[79] Throughout this litigation, Defendants have made a variety of arguments seeking to invalidate the Consent based on fraud. I admit that, given the ever-shifting nature of the claims, the lack of useful direction at trial, and the complicated factual background of the case, it has been difficult to identify precisely the misrepresentations (or omissions) at issue. As best I can discern, it appears the various fraud claims can roughly be organized by the three purchase agreements whereby certain members of the Control Group acquired their iFresh shares—the Zhou and Ou Agreement, the RET Wine Agreement and the Jiuxiang Agreement.[80]

The parties agree that all three purchase agreements are governed by New York law because of the choice of law provisions in the contracts.[81] Delaware

---

money damages are available and will make plaintiff whole."); D.I. 146, Ex. 2 (HK Share Purchase Agreement) § 8.9 (New York choice of law provision).

[79] *E.g.*, *Kahn Bros. & Co.*, 1988 WL 122517, at \*5; *Genger*, 26 A.3d at 200.

[80] JX 85 ("Zhou and Ou Purchase Agreement"); JX 88 ("RET Wine Agreement"); JX 111 ("Jiuxiang Agreement").

[81] *See* Zhou and Ou Agreement § 4(b); RET Wine Agreement § 9.7; Jiuxiang Agreement § 9.7; Defs.'/Countercl. Pls.' Post-Trial Reply Br. (D.I. 204) at 1 n.1 ("New York law governs Defendants' claims relating to the purchase agreements, including fraud claims."); Pls.' Post-Trial Br. (D.I. 198) at 8 ("All three transactions are governed by New York law.").

courts generally respect parties' choice of law and, having been given no reason not to, I analyze the fraud claims under New York law.[82]  To prevail on a claim of fraud, the plaintiff must prove *by clear and convincing evidence* a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff, and damages.[83]  "The clear and convincing evidence standard requires the party bearing the burden of proof to 'adduce evidence that makes it highly probable that what he or she claims is what actually happened.'"[84]

Defendants have failed to prove fraud by clear and convincing evidence, such that the Consent should be set aside.  For the sake of thoroughness, I address Defendants' arguments on their terms.  Before doing so, however, it is important to

---

[82] *ABRY P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1046 (Del. Ch. 2006) ("The courts of Delaware are bound to respect the chosen law of contracting parties, so long as that law has a material relationship to the transaction.").  As noted above, iFresh's principal place of business is New York, which surely places New York in a "material relationship" with the transactions at issue in this case.

[83] *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195 (N.Y. 2007) (stating the elements of common law fraud); *Gaidon v. Guardian Life Ins. Co. of Am.,* 725 N.E.2d 598, 607 (N.Y. 1999) ("The elements of fraud are narrowly defined, requiring proof by clear and convincing evidence . . . .").  As for the standard of proof, New York and Delaware law may differ.  *See Project Boat Hldgs. v. Bass Pro Gp., LLC*, 2019 WL 2295684, at *23 (Del. Ch. June 4, 2019) (noting "[t]here is some uncertainty in our law as to whether a plaintiff asserting fraud must prove the claim by clear and convincing evidence or whether a preponderance of the evidence will suffice") (collecting cases).

[84] *Currie v. McTague*, 921 N.Y.S.2d 364, 366 (App. Div. 2011) (quoting *Krol v. Eckman*, 681 N.Y.S.2d 885, 887 (App. Div. 1998)).

confront what appears to be a fundamental flaw in the assumption underlying each of Defendants' fraud theories—that a party seeking to buy a company's stock has a common law duty (as opposed to a statutory duty) to disclose when doing so that he ultimately intends to take control of the company. That is not the law of Delaware and, as best I can discern, it is not the law of New York either.[85] With this in mind, I address the alleged fraud with respect to each of the agreements at issue in turn.

### a. The Zhou and Ou Purchase Agreement

Defendants argue that Zhou fraudulently induced iFresh to enter into the Zhou and Ou Purchase Agreement. Recognizing their burden to prove "a knowing misrepresentation of a material present fact,"[86] Defendants claim the trial evidence establishes that Section 3(c) of the agreement, the "Securities Law Compliance" provision, was materially false in three respects.[87]

---

[85] *See, e.g.*, *Bachmann v. Ontell*, 1984 WL 21204, at *1 (Del. Ch. Nov. 7, 1984) (holding that preventing an attempt to take control of a company for the purpose of liquidating it is not an affirmative defense in a Section 225 proceeding). The Court requested that the parties, particularly Defendants, provide any nuance or law to the contrary, should it exist. Tr. 340:18–24 (The Court). Defendants failed to do so. Instead, they argued for the first time in their post-trial reply brief that Zhou's failure to disclose his intent to take control of iFresh somehow caused iFresh (and Deng) to forego a "control premium." Defs./Countercl. Pls.' Post-Trial Reply Br. ("DRB") (D.I. 204) at 24–25. Setting aside that the argument comes far too late, it also assumes, wrongly, that Defendants proved Zhou controlled the other stockholders who comprised the Control Group at the time they acquired their iFresh shares, or how these separate transactions would implicate a control premium.

[86] *Louie's Seafood Rest., LLC v. Brown*, 157 N.Y.S.3d 509, 512 (App. Div. 2021).

[87] Zhou and Ou Purchase Agreement § 3(c).

*First*, Defendants contend that Ou misrepresented that he was buying his shares for his "own account for investment, not as a nominee or agent."[88] According to Defendants, Ou was a straw buyer acting under the control of his boss, Zhou.[89] As support, Defendants point to testimony where Zhou refers to all of the shares transferred in the deal, including Ou's portion, as "his shares."[90] They also argue that Ou's investment was not for his "own account" because Ou purchased his shares with a loan he received from a party related to Zhou.[91] According to Defendants,

---

[88] *Id.*

[89] Am. Countercl. ¶ 39. Defendants rely on a piece of Ou's deposition to establish that Ou considered Zhou his boss. *See* Ou Dep. 76:3–6 ("Q. Who did you hear this from? A. My boss. Q. You mean Zhou Dengrong? A. That's right."). But Ou also testified that he did not view Zhou as his "boss" at XT Energy, which is the company at issue. Ou Dep. 54:19–21. He also explained that his father-in-law referred to Zhou as "boss," so he did as well out of respect. Ou Dep. 55:8–13.

[90] Tr. 56:1–56:11 (Zhou) ("A. I was originally told that the share [price for the private placement] would be 68 cents per share. Later on, the price was changed to $1.35. Q. Would that give you more or less shares than you initially thought? A. I would get less shares. Using 68 cents as the price, I would have gotten 3,670,000 shares.").

[91] According to an iFresh 13D filed after the fact, "[t]he source of funds for Mr. Zhou's purchase was an interest free loan from Mr. Bin Zhou in the amount of $1,446,413, payable on demand. The loan was made pursuant to an oral agreement between Mr. Zhou and Mr. Bin Zhou. The source of funds for Mr. Ou's purchase was an interest free loan from Mr. Bin Zhou in the amount of $1,010,000, payable on demand, and an interest free loan from Ms. Yun Kang in the amount of $43,587, payable on demand, for an aggregate purchase price of $1,053,587. The loans were made pursuant to oral agreements between Mr. Ou and Mr. Bin Zhou and Ms. Yun Kang, respectively. Mr. Bin Zhou is the nephew of Mr. Zhou." JX 114. Among other things, this disclosure reveals that, contrary to Defendants' feigned ignorance, the company itself was well aware of the source of funds Ou used to acquire iFresh shares.

the source of Ou's funds was concealed from iFresh "in order to position Qiang Ou as an ostensibly independent and unrelated party."[92]

Setting aside materiality, to prove that a misrepresentation occurred, Defendants must convince the Court by clear and convincing evidence that Ou did not invest on his own account but rather as an "agent or nominee" of Zhou.[93] They have not done so. Zhou testified that Deng expressed to him that iFresh needed a $2.5 million investment to avoid being delisted from NASDAQ and the initial plan was for Zhou to be the sole investor.[94] Ou was brought in as an investor because Zhou did not have enough US dollars to meet iFresh's needs.[95] Accordingly, Ou entered into the Purchase Agreement as Zhou's co-investor.[96] Still, Ou testified repeatedly and credibly that he was the controller of his shares, not Zhou.[97]

---

[92] Am. Countercl. ¶¶ 142–43.

[93] *See Gaidon*, 725 N.E.2d at 607 (requiring each element of fraud to be proven by clear and convincing evidence).

[94] Tr. 54:12–55:11 (Zhou) (explaining that Deng asked him to "save iFresh" because Deng "needed to raise $2.5 million in order to comply with the SEC rules so that it wouldn't get delisted").

[95] Tr. 54:12–16 (Zhou) ("Q. Was the investment $2.5 million? A. Yes. Actually, the investment was $2.5 million, but I only had over – a little over a million dollars. That's why, later on, another investor, Ou Qiang, was brought in.").

[96] *See* Zhou and Ou Purchase Agreement at 7 (Zhou signing as "Investor" and Ou signing as "Co-Investor").

[97] Ou Dep. 121:5–123:7 (testifying that he was not under the control of any person or entity with respect to the exercise of his rights as an iFresh shareholder).

As for the source of Ou's funds, the fact the shares were purchased with borrowed money does not mean Ou's investment was not for his own account. And Defendants have not explained how or where the Purchase Agreement expressly requires Ou to disclose that the funds used to acquire the shares were sourced through a loan. In any event, as mentioned, that loan was later disclosed in a public filing.[98]

*Second*, Ou represented in Section 3(c) that he was an "accredited investor, as such term is defined in Rule 501 of Regulation D, promulgated under the Securities Act."[99] Defendants claim Ou was not an accredited investor, rendering this representation materially false.[100]

The Securities Act defines an "Accredited Investor" as any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000.[101] To prove Ou did not meet this definition, Defendants rely entirely upon Ou's testimony that his individual net worth was less

---

[98] JX 114 at Item 3 (Schedule 13D disclosing the source of funds for Mr. Ou's purchase was an interest free loan from Mr. Bin Zhou in the amount of $1,010,000, payable on demand).

[99] Zhou and Ou Purchase Agreement § 3(c).

[100] DOB at 17.

[101] 17 C.F.R. 230.501(a)(5).

than $500,000.[102]  But, according to the "Accredited Investor" definition, net worth includes the net worth of one's spouse, and the only relevant evidence regarding Ou's spouse's financial condition comes from Zhou, who testified credibly and without challenge that Ou's "wife's family was very rich."[103]  Here again, Defendants were obliged to prove a knowing misrepresentation by clear and convincing evidence.  Given the failure to address the "Accredited Investor" definition in full, Defendants failed to meet their burden.

*Third*, Defendants argue that Zhou misrepresented that he was "not subject to the 'Bad Actor' disqualification, as such term is defined in Rule 506 of Regulation D, promulgated under the Securities Act."[104]  Defendants did not raise their "Bad Actor" argument until their opening post-trial brief.[105]  The argument was not previewed in the Amended Counterclaim, the pretrial order or Defendants' pretrial brief.  It is deemed waived.

It also fails on the merits.  According to Defendants, Zhou was a "Bad Actor" because he owned over 20% of the outstanding iFresh shares even though he had a

---

[102] Ou Dep. 33:24–34:5.

[103] Zhou Dep. 29:4–5.

[104] DOB at 6; Zhou and Ou Purchase Agreement § 3(c).

[105] *See* DOB at 6.

qualifying criminal conviction within the past 10 years.[106]  Even if Zhou satisfied the

20% ownership requirement,[107]  Zhou did not need to disclose his conviction in

China because, according to unrebutted evidence of which the Court may take

judicial notice, the "Bad Actor" definition is not triggered by convictions entered in

a foreign court.[108]

Defendants point to Zhou's legal troubles in China not just to argue that Zhou

meets the definition of "Bad Actor" as used in the Zhou and Ou Purchase Agreement,

---

[106] 17 CFR § 230.506(d)(1)(i) (defining "Bad Actor").

[107] Zhou disputes this proposition.  *See* PAB at 19–20.  According to Zhou, he attempted to buy HK XD for $3.5 million, which would have put him over the 20% ownership requirement.  Tr. 38:6–39:9 (Zhou).  But the deal never finalized because, according to Zhou, Deng had already sold the shares to another buyer.  Tr. 42:6–14 (Zhou).  The parties are in separate litigation surrounding this dispute.  *Id*.  The ownership dispute is also relevant to Defendants' claim, made perfunctorily in their post-trial answering brief, that Zhou failed to file a Form 13D regarding his ownership of more than 20% of iFresh.  Besides Zhou's steadfast contention that he did not own 20% of the outstanding shares of iFresh, he also points out that a Form 13D was filed when the "government records were updated in Hong Kong" to reflect that Zhou never owned HK XD, and that "it is [] incredible for Defendants to claim they were somehow in the 'dark' about [Zhou's] belief as to his ownership stake when he was investing in March of 2020" because "it was *Deng* . . . who brokered the sale."  PAB at 18.  Zhou's argument is persuasive and supported by the credible evidence presented at trial.

[108] *See* DRE 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); PAB at 18–19 (quoting SEC Compliance and Disclosure Interpretations, Interpretive Answer to Question 260.20) ("**Question**: Is disqualification under Rule 506(d) triggered by actions taken in jurisdictions other than the United States, such as convictions, court orders, or injunctions in a foreign court, or regulatory orders issued by foreign regulatory authorities? **Answer**: No.") (emphasis in original).

such that Zhou's failure to disclose his legal troubles amounted to contractual fraud, but also to argue that Zhou engaged in extra-contractual fraud.[109] On January 16, 2020, Deng sent Zhou an article about a "Xiangtian [] share scam that went on 8 years," to which Zhou replied that Jiuxiang "[h]as not the slightest connection with Xiangtian" and that legal due diligence would confirm Jiuxiang was an "independent legal person."[110] He also said the report was comprised of "[i]ntentionally made up rumors."[111] Zhou testified at trial that he disclosed to Deng that he was "suspected to be involved" in a "multilevel marketing case."[112] Defendants argue these representations were false and misleading because Zhou was indisputably investigated, detained and sentenced for criminal activity in China in connection with Xiangtian and a multi-level "pyramid" scheme.[113] The argument is not persuasive.

---

[109] Defendants also point to extra-contractual statements Zhou made to unrelated parties, such as investors discovered after the stock sale, as supporting a claim for fraud. *See* DOB at 7–11. This argument fails. Defendants could not have relied on statements they did not know about. Nor do Zhou's statements to unrelated parties have anything to do with his or his supposed allies' acquisition of iFresh shares.

[110] JX 46B at 21–22.

[111] *Id.* at 22.

[112] Tr. 61:23–62:1 (Zhou). Deng testified that Zhou did not disclose his prior conviction to him at any time. Tr. 304:4–6 (Deng).

[113] *See* PTO ¶¶ 45–48; Tr. 230:4–7 (Zhou) ("Q. So the people below you took his money in the pyramid scheme, correct, not you? A. Correct. Well, I didn't take the money. They have a team leader. Their team leader took the money."); JX 6A at 18 ("On January 16,

As a preliminary matter, it is difficult to see how Zhou's omissions or misleading statements, which were not the subject of any specific representations in the Zhou and Ou Purchase Agreements, factually could support a fraud claim where the contract contains a rather broad integration clause and Defendants made no attempt to prove why they would have agreed to that clause if they, in fact, had secured "prior agreements, . . . understandings [or] communications" not reflected in the contract.[114] Even accepting Defendants' argument that the integration clause was not specific enough to disclaim reliance, the fraud claim still fails.[115] The inquiry is whether Defendants have proven by clear and convincing evidence that Zhou defrauded them in a manner that would justify a declaration that his attempt to

---

2016, Zhou Dengrong was sentenced . . . for the crime of organizing and leading pyramid selling activities.").

[114] *See* Zhou and Ou Purchase Agreement § 4(e) ("<u>Entire Agreement</u>. This Agreement constitutes and contains the entire agreement among Company and the Investor and supersede[s] any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.").

[115] DRB at 10–11; Zhou and Ou Purchase Agreement at § 4(e). To be sure, there is support in Delaware and New York law that a general integration clause will not bar a fraud claim. *See Basis Yield Alpha Fund (Master) v. Goldman Sachs Gp., Inc.*, 980 N.Y.S.2d 21, 28 (App. Div. 2014) ("[O]nly where a written contract contains a specific disclaimer of responsibility for extraneous representations, that is, a provision that the parties are not bound by or relying upon representations or omissions as to the specific matter, is a plaintiff precluded from later claiming fraud on the ground of a prior misrepresentation as to the specific matter."); *Kronenberg v. Katz*, 872 A.2d 568, 592 (Del. Ch. 2004) ("[M]any learned authorities state that typical integration clauses do not operate to bar fraud claims based on factual statements not made in the written agreement.").

vote his iFresh shares was void. Defendants would need to point to something that caused the transaction by which Zhou acquired his shares—the Zhou and Ou Purchase Agreement—to be tainted by fraud to a degree that it is reasonable to conclude the transaction would not have been consummated had the fraud been detected pre-closing. Zhou's supposed extra-contractual denial of his association with the pyramid scheme, in my view, as a matter of persuasive evidence, does not rise to that level, regardless of the specificity, or not, of the integration clause.

Additionally, Defendants could not have reasonably relied on Zhou's messages to Deng because Zhou's conviction was a matter of public record.[116] Defendants themselves appear to admit that this was disclosed in public records in their Amended Counterclaim.[117] Deng also testified at trial that he did not ask Zhou about his conviction prior to his investment.[118] Indeed, at Deng's express direction,

---

[116] The conviction was disclosed in domestic public filings and Chinese criminal records. *See* JX 2 at Item 5.02 (disclosing Zhou as the subject of an investigation by the Chinese government); JX 6 (Chinese Criminal Judgment); JX 17 at 24 (Xiangtian Form 10-K explaining Zhou was involved in an alleged pyramid-style marketing campaign in 2013).

[117] *See* Am. Countercl. ¶ 18 ("Dengrong Zhou's involvement in pyramid stock schemes was disclosed in various filings of Xiangtian (USA) Air Power Co., Ltd., *inter alia*, Xiangtian (USA) Air Power Co., Ltd.'s 2018 10-K, which stated 'Zhou Dengrong, the former CEO, was involved in an alleged allegation of pyramid marketing campaign in 2013.' Press coverage of the scheme stated Xiangtian Group 'has been fined and confiscated nearly 100 million yuan' for the pyramid stock scheme.").

[118] Tr. 322:5–8 (Deng) ("Q. Mr. Deng, did you ever ask Mr. Zhou whether he was convicted prior to taking his money in March of 2020? A. No.").

no formal due diligence was performed on Zhou or Ou.[119] Under New York law, "where a party has the means, by the exercise of reasonable diligence, to ascertain the truth or falsity of material representations, he or she cannot assert justifiable reliance."[120] In any event, the credible evidence revealed that iFresh needed investors and that it likely would have accepted Zhou's investment regardless of his criminal conviction in China.[121]

The same is true for the other supposed misrepresentations identified by Defendants. As representatives of a publicly traded company, Defendants could have readily determined whether Ou and Zhou met the requirements of Section 3(c) by exercising reasonable due diligence.[122] Again, iFresh performed no due diligence

---

[119] JX 84 ("There is no official due diligence report of these two investors. . . . Mr. Deng also mentioned the investors have donated $200k to Hubei province in China, the hardest-hit area by Coronavirus. Mr. Deng said he has friends who know these two investors too and have a good reference of these two investors.").

[120] *Rudolph v. Turecek*, 658 N.Y.S.2d 769, 771 (App. Div. 1997).

[121] *See* JX 41 (Letter from NASDAQ notifying iFresh that it was not compliant with Listing Rule 5550(b), which states that "For continued inclusion, the issuer shall maintain either: (1) stockholders' equity of $2.5 million; or (2) market value of listed securities of $35 million; or (3) net income from continuing operations of $500,000 in the most recently completed fiscal year or two of the last three most recently completed fiscal years."); *see also* Tr. 304:22–305:19 (Deng) (explaining that he was seeking investments to maintain iFresh's NASDAQ listing and he thought Zhou's investment would be "much simpler" than other options and would provide iFresh "a lot more money").

[122] Defendants argue that they may claim reliance on Zhou's alleged misrepresentations notwithstanding the lack of diligence and ready public disclosure of the information because the misrepresentations were within Zhou's "peculiar knowledge." DRB at 11–15. New York's "peculiar knowledge" carveout to fraudulent misrepresentation is inapplicable here. Defendants and iFresh are sophisticated parties who were represented by counsel

31

because Deng directed that diligence was not necessary.[123] For his part, Fang

acknowledged that no inquiry was made regarding Ou's source of funds.[124] Then,

when the source of Ou's funds was publicly disclosed in a 13D filing, Defendants

took no action to address the supposed issue.[125] According to Fang, he expected

iFresh's counsel, Loeb & Loeb, to review relevant public filings in the course of

their due diligence.[126] Viewed together, the evidence does not support a finding that

---

when entering into each of the purchase agreements at issue. The peculiar-knowledge exception has been rejected by courts when sophisticated parties could have negotiated contractual protections for themselves. *See, e.g.*, *Psenicska v. Twentieth Century Fox Film Corp.*, 409 F. App'x 368, 371 (2d Cir. 2009) (finding peculiar-knowledge exception does not apply "where a party could have insisted that the written contract terms reflect any oral undertaking on a deal-breaking issue"); *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 115 (Del. 2021) (applying New York law and determining that the exception was inapplicable where two sophisticated parties could have "insisted on contractual protections for themselves.").

[123] JX 84.

[124] Tr. 281:9–15 (Fang) ("Q. Now, the other part of the investment that you thought was problematic was that Mr. Ou didn't disclose where he got his funds. Correct? A. Correct. Q. But, again, you never asked him, did you? A. No.").

[125] JX 114 at Item 3 (Schedule 13D disclosing the source of funds for Mr. Ou's purchase was an interest free loan from Mr. Bin Zhou in the amount of $1,010,000, payable on demand); PTO ¶ 52 ("Bin Zhou is [Plaintiff] Dengrong Zhou's nephew").

[126] Tr. 261:9–20 (Fang) ("Q. You did your own due diligence? A. Yes. Q. Did you rely on due diligence by Loeb & Loeb? A. Yes. Q. And Loeb & Loeb is a major law firm; correct? A. Yes. Q. And you had testified that you expected Loeb & Loeb to review public filings; right? A. I don't recall what I testified, but that seems reasonable, yeah."); Tr. 262:7–17 (Fang) ("Q. Okay. And, in fact, your pleading quotes several public filings, including where you got the fact that Mr. Zhou was implicated in multi-level marketing; correct? A. Yes. . . . Q. And that was the sort of document you would have expected Loeb & Loeb to review as part of his due diligence; correct? A. Yes.").

Defendants justifiably relied on any of the representations within Section 3(c) or the alleged extra-contractual representations regarding Zhou's criminal history.[127]

### b. The Tong and Huang RET Wine Acquisition

Defendants also seek to invalidate the votes of shares acquired by Kairui Tong and Hao Huang when they sold their interests in RET Wine to iFresh.[128] In support of this fraud claim, Defendants assert that Section 3.6 and Section 3.9 of the RET

---

[127] Defendants argue that iFresh's due diligence efforts are irrelevant as to reliance because "express contractual representations are at issue" and their reliability, therefore, is "absolute." DRB at 5. Specifically, Defendants contend that "New York courts uniformly require that, for a contractual warranty to be inapplicable, the sellers themselves must have actively disclosed that their warranties were no longer true prior to the completion of the transaction." *Id*. at 6 (internal quotation marks omitted). Defendants muddle the distinction between fraud reliance and breach of warranty reliance. In this regard, they cite *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) and *Preferred Fragrance, Inc. v. Buchanan Ingersoll & Rooney PC*, 2015 WL 6143612, at *3 (E.D.N.Y. Oct. 18, 2015), but both cases state the reliance rule specific to a breach of an express warranty. The New York Court of Appeals has distinguished the reliance requirement in an action for breach of warranty from the reliance requirement in an action for fraud. *See CBS, Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000 (N.Y. 1990). In a breach of warranty action, the critical question is whether the promisee believed that he was purchasing the promisor's promise as to the truth of the representation, regardless of reasonable reliance. *Id*. In a fraud action, by contrast, the plaintiff must prove reasonable reliance upon the truth of the representation and a change of position in reliance on that belief. *Id*. Thus, to prove reasonable reliance upon an express contractual representation for the purposes of fraud, the plaintiff must prove that he "believed [the representation] to be true. If it appears that he knew the facts, or believed the statement to be false, or that he was in fact so skeptical as to its truth that he reposed no confidence in it, it cannot be regarded as a substantial cause of his conduct." *Ainger v. Mich. Gen. Corp.*, 476 F. Supp. 1209, 1224 (S.D.N.Y. 1979). Defendants failed to prove such reasonable reliance here. And, in any event, Defendants' reliance argument is ultimately inconsequential because it hinges on the assumption that Zhou provided a false representation or warranty, which also was not proven.

[128] DOB at 23–24.

Wine Agreement reflect fraudulent misrepresentations by the sellers.[129] In Section 3.6, Tong and Huang represented and warranted that they held "good and valid title to Equity Interests [of RET Wine], free and clear of all Encumbrances."[130] And in Section 3.9, they represented that, "other than Sellers," RET Wine was "not Controlled by any Person" and that there were no undisclosed affiliates.[131] In addition to this alleged contractual fraud, Defendants argue that extracontractual statements made by Amy Xue to an iFresh Board member to the effect that RET Wine's financials were reliable because they were audited by Friedman LLP, and that XT Energy had "sold [RET Wine] off," were also false and misleading.[132]

Defendants' only reference to Section 3.6 of the RET Wine Agreement in *any* document before trial is a passing (and untimely) reference in the facts section of their pretrial brief.[133] Section 3.6 is not discussed in the Amended Counterclaim or

---

[129] *Id.*

[130] RET Wine Agreement § 3.6(c).

[131] RET Wine Agreement § 3.9.

[132] JX 77 at 1.

[133] D.I. 175 at 10 ("Section 3.6 of the purchase agreement stated that 'Sellers,' *i.e.* Tong and Huang held 'good and valid title to the Equity Interests [of RET Wine being sold], free and clear of all Encumbrances.'"); *id.* at 11 (observing that "despite their representation that their ownership of RET Wine's equity was 'free and clear of all encumbrances,' neither Tong nor Huang had paid [a] single dime to XT Energy for RET Wine").

the pretrial order.[134]  The argument that Section 3.6 reflects a contractual fraudulent misrepresentation was not articulated until the opening post-trial brief.[135]  The argument is deemed waived.[136]

On the merits, Defendants have not shown by clear and convincing evidence that Sections 3.6 and 3.9 were knowingly false.  Defendants argue that Tong and Huang did not own RET Wine's equity interests free and clear of all encumbrances because they had not made payments to XT Energy, RET Wine's previous owner, until after selling those equity interests to iFresh.[137]  Thus, according to Defendants, when iFresh purchased RET Wine it was still controlled and encumbered by its previous owner, XT Energy.[138]  And because Ou, XT Energy's newly appointed COO, supposedly reported to Zhou, "that meant that [Zhou] controlled RET Wine as well."[139]  Defendants also argue that RET Wine was controlled and encumbered by XT Energy because XT Energy still possessed RET Wine's corporate seals when

---

[134] *See generally* PTO; Am. Countercl.  In contrast, Section 3.9 is mentioned a handful of times in the Amended Counterclaim.  *See* Am. Countercl. ¶¶ 60–61, 153.

[135] DOB at 23.

[136] *See Snow Phipps*, 2021 WL 1714202, at *44.

[137] DOB at 23–24.

[138] *Id.*

[139] *Id.* at 24.

Tong and Huang sold RET Wine to iFresh.[140] Each of these arguments fail, either for want of requisite proof or want of a plausible theory.

Defendants did not prove that RET Wine was encumbered by XT Energy. Defendants rely on an unauthenticated spreadsheet produced by Friedman LLP, XT Energy's auditor, to support their argument that Tong and Huang did not make payments to XT Energy with respect to its interest in RET Wine until after they sold the company to iFresh.[141] Even if the spreadsheet supported the inference that Tong and Huang had not yet made full payment to XT Energy, it does not establish by clear and convincing evidence that the lack of payments meant RET Wine was encumbered or that XT Energy maintained control over RET Wine such that a disclosure to the contrary was materially false. In fact, public filings and contemporaneous emails are consistent in stating that XT Energy sold off its interest in RET Wine prior to the sale to iFresh.[142]

---

[140] *Id.* at 23–24.

[141] *See* JX 32.

[142] *See* JX 55 (XT Energy 8-K dated December 20, 2018) ("On January 6th, 2020, the company (90% owner of Rongentang Wine Company) and Mr. Chen, Dahuan (10% co-owner of Rongentang Wine Company) jointly entered into an [sic] Sales Agreement with Mr. Tong, Kairui and Mr. Huang, Hao (the Buyers / Tong – 60% and Huang [–] 40%) to sell co-owned Rongentang Wine Company for 75 million yuan (RMB)."); *see also* JX 72 (March 15, 2020 email to all iFresh directors with 2019 Valuation Report attached (JX 72A). The attached Valuation Report stated XT Energy entered into an investment agreement obtaining "90% equity interest in both [RET Companies]."); JX 77 (March 18,

36

Nor did Defendants prove that Tong and Huang or RET Wine were controlled by Zhou through his alleged control of XT Energy. Zhou credibly denied having any control over XT Energy after 2014 when he sold his shares and stepped down from management at the company, which is a separate entity from Xiangtian.[143] He testified that public disclosures revealed that his brother was the CEO, and the company had an independent board of directors.[144] Zhou also had minimal connection to Tong and Huang; he testified he had never met Huang and that he had met Tong only once.[145] Zhou also did not have any proven financial connection to

---

2020 email to all iFresh directors, including Defendants and iFresh counsel, stating, "XT Energy sold [RET Wine] off on January 6, 2020 to two individuals.").

[143] Tr. 27:20–28:12 (Zhou) ("Q. Was there a point in time where you owned both companies? A. Prior to 2014, I was a founder, but I have nothing to do with it since 2014. Q. And what changed in 2014 with respect to XT Energy? A. I became a suspect of a multilevel marketing case, and I withdrew from the company. Q. Was that publicly disclosed by the company? A. Yes. It was public information. Q. Do you still own any shares of XT Energy? A. No, I don't. Q. Do you still have a role in running XT Energy? A. I don't."); Tr. 27:12–19 (Zhou) ("Q. Now, this lawsuit mentions XT Energy multiple times. Are you aware of this? A. No. Q. It also mentions Xiangtian. Are you aware of this? A. Yes. Q. Are those the same company? A. They're not."); Tr. 113:20–114:2 (Zhou) ("XTEG is a separate independent company. It has an independent board. It has their own shareholder meetings. I don't know if they need to file the document in ten days – I don't know when they need to file the 10-K or 8-K. It's not part of my job. I don't have the power to direct them to do anything.").

[144] Tr. 28:13–28:22 (Zhou) ("Q. But your family members, at least until 2021, were involved in running XT Energy. Correct? A. My family – well, it was an independent board of directors. Q. But your brother was the CEO. Correct? A. Correct. Q. Was that publicly disclosed? A. Yes. It was in the public disclosure.").

[145] Tr. 67:23–68:10 (Zhou) ("Q. Do you have a longstanding relationship with either one of them? A. No. Q. Have you ever met Hao Huang? A. I did not. Q. How about Kairui Tong? A. I met with Kairui Tong once at a meeting before I came to the United States.

Tong and Huang's RET Wine purchase. In this regard, he credibly testified that he did not loan money to Tong and Huang to acquire RET Wine,[146] which is supported by Tong's deposition in which he testified he purchased RET Wine with funds secured in a loan from his family.[147]

XT Energy's failure to turn over RET Wine's corporate seals to Tong and Huang, by itself, also does not establish that XT Energy maintained any control over RET Wine. I do not doubt that the possession of corporate seals is important in China and that only certain corporate officers have access to them; Zhou himself testified as much.[148] But Defendants injected the argument that possession of corporate seals is powerful evidence of control too late, leaving Zhou with inadequate time to conduct discovery on the issue.[149] Moreover, Defendants

---

Q. Was that meeting about acquiring RET Wine? A. No, no. It was just another regular meeting, general meeting.").

[146] Tr. 67:20–22 (Zhou) ("Q. Did you loan the money to acquire RET Wine to Kairui Tong and Hao Huang? A. No.").

[147] Tong Dep. 48:19–23 ("Q. And where did you come up with the cash? A. From my dad, from my mom. We have our family business. We have a big family business.").

[148] Tr. 97:20–98:8 (Zhou) ("Q. Let me ask you, Mr. Zhou, are corporate seals very important in China? A. It is very important. Q. Would companies just randomly place their corporate seals on documents without knowing what they're planning? A. The corporate seal was applied by the legal department. They register that. Q. And it's a company's legal department and/or its senior management that holds onto the corporate seal. Right? This is not something that's just given away to random people to use. A. Correct.").

[149] Defendants rely on a footnote from a New York case, cited for the first time in their *post-trial reply* brief, in support of their corporate seal argument. *See* DRB at 3–4 ("As one

38

presented no expert opinion or other persuasive evidence at trial regarding the importance and consequences of possessing a corporate seal as a matter of Chinese law or practice. And counsel's "testimony" regarding these points is no substitute for competent evidence.[150] Thus, the argument that Section 3.6 or 3.9 reflect fraudulent misrepresentations by virtue of XT Energy's alleged possession of the RET Wine corporate seals is not supported by any competent, much less clear and convincing, evidence.

Finally, Amy Xue's email stating that "Rongentang's numbers . . . were audited by Friedman LLP" and that "XT Energy Group sold [] off" certain subsidiaries cannot serve as the basis for a fraud claim for the simple reason that they were not misrepresentations at all—Friedman did in fact audit the "numbers,"[151]

---

New York court observed, 'mere possession of a corporate chop is considered adequate proof of a person's authority to bind the company. As such, that little stamp grants great power.'") (citing *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 417 n.6 (S.D.N.Y. 2014)) (alterations omitted). But the legal effect of possession of the corporate seal in *Special Situations* was a finding supported by evidence presented to the court in that case. *Id.* No such evidence was presented here.

[150] Post-Trial Oral Arg. (D.I. 209) at 76:5–16 ("It's been recognized in New York that the mere possession of chops, or the seal in China, is adequate authority to bind a Chinese company. These seals are of utmost importance to Chinese corporate governance. If you have the seals in your hands, people treat you as the binding controller or principal of the company. And the seals, as Mr. Zhou testified, are kept by the corporate secretary or its legal department. And that's from a case called *Special Situations Fund III v. Deloitte Touche Tohmatsu*, 33 F. Supp. 3d 401. That's cited in our reply brief.").

[151] JX 32; JX 55; Tr. 105:11–14, 106:4–107:1, 108:12–16 (Zhou) (referring to Friedman LLP as "XT Energy's auditors").

and XT Energy Group did sell off the subsidiaries at issue.[152] There was no proven fraud.

While the failure to prove a false representation, alone, defeats the fraud claim with respect to RET Wine, the failure to prove justifiable reliance also dooms the effort to set aside the Consent on this ground. Defendants knew or readily could have known all of the facts they now allege were concealed. XT Energy's prior ownership of RET Wine was fully disclosed to iFresh directly and through public filings.[153] Additionally, Defendants' counsel at the time of the transaction, Loeb & Loeb, conducted due diligence and were involved in the sales process.[154] Prior to the transaction, Deng, David Caruso (iFresh's counsel at Loeb & Loeb), David Cheng (XT Energy's then COO), and Amy Xue were in communication regarding the RET Wine deal through a WeChat group chat,[155] further revealing XT Energy's connection with RET Wine. In fact, David Cheng explained that the

---

[152] JX 55; JX 72; JX 77.

[153] JX 55; JX 72–72B; JX 77.

[154] Tr. 261:11–20 (Fang) ("Q. Did you rely on due diligence by Loeb & Loeb? A. Yes. Q. And you had testified that you expected Loeb & Loeb to review public filings; right? A. I don't recall what I testified, but that seems reasonable, yeah."). Loeb & Loeb later withdrew from representation. Fang Dep. 31:13–22 ("Q. Yeah, I know. So your understanding is that they withdrew because Mr. Deng made representations to them that turned out not to be true? A. Yeah. You know that's what they – that's what they – I think that was their position along with Delaware counsel.").

[155] JX 200 (WeChat communication regarding RET Wine transaction).

"Game Plan" was to "merge in [RET Wine] into [iFresh] immediately," which diminishes Defendants' contention that XT Energy sought to maintain any control over RET Wine.[156] Having all this information at their disposal, iFresh represented to NASDAQ that it was confident it had conducted proper due diligence on each of the transactions, including the RET Wine transaction.[157] Under these circumstances, the evidence does not support a finding of justifiable reliance.

### c. The Fei and Meng Jiuxiang Acquisition

Defendants make similar arguments in support of a fraudulent inducement claim regarding iFresh's acquisition of Jiuxiang. According to Defendants, Sections 3.9 and 3.13 of the Jiuxiang Agreement were fraudulent misrepresentations. Section 3.9 states that Jiuxiang is "not Controlled by any Person" other than their "Sellers."[158] Defendants contend that "Jiuxiang was under the 'Control' of Xiangtian," which was "ultimately under [Zhou's] 'Control.'"[159]

---

[156] *Id.*

[157] JX 169 at 4 (Correspondence to NASDAQ) ("The Company states senior management conducted proper due diligence at the time the Subsidiaries were acquired and they are confident the process was carried out in a manner that is consistent with legal and accounting industry practice.").

[158] Jiuxiang Agreement § 3.9.

[159] PAB at 3.

Defendants also assert that Section 3.13, which represents that Jiuxiang's financial statements are complete and accurate, was materially false when made.

These arguments were not fairly noticed by Defendants and are deemed waived. Section 3.13 is not referenced in the Amended Counterclaim, the pretrial order or Defendants' pre-trial brief. It appears for the first time in Defendants' post-trial briefing.[160] That is too late. Defendants mention the alleged misrepresentation within Section 3.9 in their Amended Counterclaim, but Section 3.9 is not referenced in their pretrial brief or opening post-trial brief.[161] The argument relating to Section 3.9 does not resurface until Defendants' post-trial reply brief.[162] Again, the argument comes too late and is deemed waived.

Both arguments also fail on their merits. As for Section 3.13, Defendants have not proven that the representation was false. Defendants claim that Zhou "tried to pump up Jiuxiang's sales by exhorting Xiangtian investors to buy on it," which "drove Jiuxiang's revenues at Zhou's instigation."[163] Even if true, which is difficult to discern from the evidence, the best Defendants could say is that Jiuxiang benefited

---

[160] DOB at 15–16.

[161] *See* Am. Countercl. ¶¶ 88–89, 162. To clarify, Section 3.9 of the RET Wine Agreement is mentioned in the pre-trial brief, as noted above, but not Section 3.9 of the Jiuxiang Agreement.

[162] DRB at 3.

[163] DOB at 12.

from Zhou's efforts to urge people he knew or had influence over to use the platform. That is a far cry from proving by clear and convincing evidence that the company's financial statements were somehow inaccurate or not prepared in good faith; the sales reflected in the financial statements actually occurred, even if at Zhou's urging. Moreover, Defendants made no real effort to prove the impact of Zhou's efforts to boost sales such that the Court could find that the representation was *materially* false.

As for Section 3.9, the agreement defines "Affiliate" as "any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person."[164] "Control" is defined as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person."[165] Zhou testified that Xiangtian was his company.[166] But the links Defendants proffer between Xiangtian and Jiuxiang do not establish that Xiangtian or Zhou were in control of Jiuxiang.

Defendants point to three facts that purportedly illustrate Zhou's control over Jiuxiang: (1) Zhou's efforts to get Xiangtian investors to utilize Jiuxiang's platform,

---

[164] Jiuxiang Agreement § 1.1.

[165] Jiuxiang Agreement § 1.7.

[166] Tr. 29:19–21 (Zhou) ("Q. You still have a separate company called Xiangtian. Correct? A. Yes.").

(2) "at least one Xiangtian staffer also served as Jiuxiang's senior management," and (3) Xiangtian paid for Jiuxiang's audit by Friedman LLP prior to its acquisition by iFresh.[167]  But Zhou allegedly "pumping up" sales does not establish that he or Xiangtian controlled Jiuxiang, nor, as noted, did Defendants produce any financials to illustrate the supposed impact of Zhou's efforts on the Jiuxiang valuation. Additionally, the fact that a "Xiangtian staffer" worked for both entities and that Xiangtian paid for Jiuxiang's audit does not establish that Xiangtian had sufficient "power to direct or cause the direction of the management and policies" of Jiuxiang.[168]  Moreover, Zhou credibly testified that Jiuxiang borrowed the money for the audit from Xiangtian because Jiuxiang was short on US dollars.[169]  After carefully considering the evidence, I am satisfied Defendants have not proven a misrepresentation regarding the Jiuxiang Agreement.

And, here again, there appears to be a reliance problem.  iFresh was informed of the business relationship between Zhou, Jiuxiang, XT Energy and Xiangtian before the acquisition in a due diligence report prepared by a Chinese law firm

---

[167] DOB at 12 (internal quotes omitted).

[168] *See* Jiuxiang Agreement § 1.7.

[169] Tr. 181:11–16 (Zhou) ("Q. So Jiuxiang borrowed money from XT with your authorization to pay for Friedman's audit?  A. I did not authorize.  I didn't have the power. They approached me, asked for help.  It's accounting department contacting accounting department from another company trying to borrow money.").

44

retained by iFresh.[170]  The diligence report is consistent with Meng Liu's statements that Jiuxiang was not an affiliate of XT Energy but simply maintained a working partnership with the company.[171]  The diligence report also references the Xiangtian "pyramid scheme and scam," which Defendants assert was concealed by Zhou.[172]  Fang testified that he did not read the due diligence report because it was written in Chinese, and he did not recall whether it was ever translated.[173]  That is not behavior reflective of reasonable reliance.

*   *   *   *   *

Zhou carried his *prima facie* burden to prove that the Consent reflected the votes of a majority of the iFresh common stock issued and outstanding at the time, and that the Consent otherwise complied with iFresh's constitutive documents and Delaware law.  Defendants' attempt to prove that the shares voted in the Consent were obtained by breach of contract, fraud or other wrongdoing failed for want of

---

[170] JX 102 (July 6, 2020, email to iFresh directors with due diligence report from iFresh's Chinese lawyers); JX 102AA at 23, 63 (Jiuxiang Due Diligence Report referencing that Jiuxiang "is related to XT Energy to some extent," and "Ms. Liu Meng of Jiuxiang Lantian is familiar with Mr. Zhou."  The report also indicates a business relationship between Jiuxiang and XT Energy.).

[171] Liu Dep. 87:8–11 ("Jiuxiang Lantian and Xiangtian Energy have no affiliation, relationship.  It's only work partnership.").

[172] JX 102AA at 19.

[173] Tr. 292:5–22 (Fang) ("I definitely didn't read [the report in JX 102A].  I didn't read a Chinese report.").

45

adequate proof or failure properly to preserve and present the arguments. Accordingly, my verdict is for Plaintiff.

## III. CONCLUSION

For the foregoing reasons, judgment is entered for Plaintiff. The Court declares that:

(1) The Consent is valid and effective, and the corporate action taken in the Consent was effective upon delivery;

(2) Defendants, Deng and Fang, were validly removed as directors of iFresh; and

(3) Qiang Ou and Jiandong Xu were validly elected as directors of iFresh.

The Counterclaims are dismissed in their entirety with prejudice. Plaintiff is entitled to recoverable prevailing party costs and expenses under Chancery Rule 54(d).[174] There shall be no award of attorneys' fees.[175]

**IT IS SO ORDERED.**

---

[174] Plaintiff shall submit his bill of costs, on notice to defense counsel, by April 12, 2022, along with a proposed form of order awarding the costs. Defendants shall submit any objections to the bill of costs within five (5) days of receipt from Plaintiff's counsel. The Court's judgment will be deemed final and appealable upon entry of the Order on the bill of costs.

[175] Plaintiff requested attorneys' fees in his Complaint and in the pretrial order but did not attempt to justify the request at trial or in post-trial briefing.